Adella Chiminya TACHIONA, on her own behalf on Behalf of her late husband Tapfuma Chiminya TACHIONA, and on behalf of all others similarly situated, Efridah Pfebve, on her own behalf and on behalf of her late brother Metthew Pfebve, Elliot Pfebve, on his own behalf and on behalf of his brother Metthew Pfebve, Evelyn Masaiti, on her own behalf, Maria Del Carmen Stevens, on her own behalf, on behalf of her late husband David Yendall Stevens, and on behalf of all others similarly situated, Plaintiffs,

v.

Robert Gabriel MUGABE, in his individual and personal capacity, Zimbabwe African National Union–Patriotic Front, Stan Mudenge, Jonathan Moyo, and Certain Other Unknown Named Senior Officers of ZANU–PF, Defendants.

No. 00 CIV 6666 VM.

United States District Court, S.D. New York.

Feb. 14, 2002.

Paul Sweeney, Hogan & Hartson, L.L.P., New York City, Theodore M. Cooperstein, Theodore M. Cooperstein, PC, Washington, DC, for Plaintiffs.

## DECISION AND ORDER

MARRERO, District Judge.

In a Decision and Order dated October 30, 2001 (hereinafter the "Decision"),[1] this Court honored a "Suggestion of Immunity" filed by the United States on behalf of defendants Robert Gabriel Mugabe ("Mugabe") and Stan Mudenge ("Mudenge"), respectively President and Foreign Minister of Zimbabwe. On this basis, the Court dismissed claims against Mugabe and Mudenge set forth in Plaintiffs' class action

describing a campaign of torture, terrorism, summary executions and related violations of international law allegedly committed by these officials and other defendants.

The Court ruled, however, that Plaintiffs' claims against defendant Zimbabwe African National Union–Patriotic Front ("ZANU–PF"), of which Mugabe and Mudenge were senior officers and whose activities in this country they were promoting at the time they were served, could proceed to adjudication in this Court. In so deciding, the Court rejected the Government's contention that the action against ZANU–PF should be dismissed because the organization was not properly served with process. Such process had been effectuated through personal service on Mugabe and Mudenge. The Government argued that these officials enjoyed personal inviolability under the provisions of an applicable international treaty and, therefore, that any service of process on them should be quashed. Now before the Court is a motion by the United States requesting reconsideration of this aspect of the Decision.

In addition, the Government, not a party to the action, moves to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure for the limited purpose of preserving a right to appeal the Court's Decision.

## I. MOTION FOR RECONSIDERATION

■ The standard of review applicable to motions for reconsideration in this District is set forth in Local Civil Rule 6.3. The Rule requires parties seeking reconsideration of a court's ruling to set forth concisely by motion "the matters or controlling decisions which counsel believes the court has overlooked." Local Civil Rule 6.3.[2] The only ground properly sup-

1. The Decision is reported as *Tachiona v. Mugabe,* 169 F.Supp.2d 259 (S.D.N.Y.2001). References to it below reflect the text and page numbers of the reported version.

2. Plaintiffs challenged the Government's motion on the ground that it was not timely filed. The Court has reviewed the respective arguments concerning this issue and, having determined that the Government's motion was

porting the granting of a motion for reconsideration is that the Court overlooked matters or controlling decisions which, " 'had they been considered, might reasonably have altered the result reached by the court.' " *Schonberger v. Serchuk*, 742 F.Supp. 108, 119 (S.D.N.Y.1990) (quoting *Adams v. United States*, 686 F.Supp. 417, 418 (S.D.N.Y.1988)). Moreover, the Rule does not grant license for a party to "advance new facts, issues or arguments not previously presented to the Court." *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.*, 768 F.Supp. 115, 116 (S.D.N.Y. 1991) (citations omitted).

The Government argues that the interpretation given by the State Department to the provisions of treaties to which the United States is a party is entitled to an extremely high degree of judicial deference, and that in this case the Court's Decision overlooked and is contrary to

"clear and binding authority requiring courts to give 'great weight' to the Executive Branch's reading of treaty terms"— here the concept of "inviolability" as defined in the Vienna Convention on Diplomatic Relations (the "Vienna Convention").[3] The Government faults the Court's Decision on the ground that it "neither cites this authority nor exhibits any deference whatsoever to the Executive Branch's construction of the relevant provision."[4] (Government Memorandum, at 5.) The Court disagrees.

The Decision sets forth at length the respective views of Plaintiffs and the Government regarding the applicability of the principle of personal inviolability to the circumstances before the Court as they pertained to the service of process upon Mugabe and Mudenge related to Plaintiffs' claims against ZANU–PF. *See Tachiona,*

---

timely, deems further discussion of this issue unnecessary.

**3.** Memorandum of Law in Support of the United States' Motion for Reconsideration, dated Dec. 18, 2001 (hereinafter "Government Memorandum"), at 3–4. In support of its position, the Government cites *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from clear treaty language, [the court] must, absent extraordinarily strong contrary evidence, defer to that interpretation."); *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ("[T]he meaning given [treaty provisions] by the departments of government particularly charged with their negotiation and enforcement is given great weight."); *767 Third Ave. Assocs. v. Permanent Mission of Zaire*, 988 F.2d 295, 301–02 (2d Cir.1993). *See also* Vienna Convention, *done* April 18, 1961, *United States accession*, December 13, 1972, 23 U.S.T. 3227, 500 U.N.T.S. 95.

**4.** In addition, the Government "expressly disavows" a reference in the Decision to ZANU–PF as an "intended beneficiary" of the Government's position. (Government Memo-

randum, at 10 n. 3). The Court acknowledges the Government's concern, but finds the strenuous disavowal unnecessary. The Court did not intend by this reference to suggest in any way that the Government's position in this case was specifically motivated by a design to benefit ZANU–PF. Rather, the Court's meaning is more generic, expressing concern over what might occur in future instances under the Government's theory here, as well as what would occur as an indirect effect even if not specifically intended. Earlier in the Decision, the Court unequivocally recognized the precise scope of the Government's Suggestion of Immunity with regard to ZANU–PF: "Consequently, while the State Department's Suggestion of Immunity does not purport to assert immunity on behalf of ZANU–PF, and the Government has not maintained in this proceeding that ZANU–PF is entitled to invoke any form of immunity from the exercise of the Court's jurisdiction, the Government's inviolability theory effectively would achieve the same result by indirectly shielding ZANU–PF, under the cover of Mugabe's head-of-state immunity, from the reach of territorial jurisdiction." *Tachiona*, 169 F.Supp.2d at 303.

169 F.Supp.2d at 302–03. Specifically, the Court noted that

> [t]he Government further maintains that the service of process is an assertion of jurisdiction and is thus precluded as to persons who enjoy immunity from the Court's jurisdiction because if personal jurisdiction is lacking, then service of process is void. Moreover, the Government asserts that "the State Department considers that personal inviolability under Article 29 of the Vienna Convention precludes the service of compulsory legal process on diplomatic agents."

*Id.* (citations omitted).

After examining the Government's contention, the historical roots of the principle of inviolability and the limited case law addressing the scope of the doctrine, the Court found insufficient support for the position the Government articulated. On this basis point, the Court concluded that it must "part[ ] company with the Government's view." *Id.* at 304.

This discussion could not have been framed more explicitly to manifest that, rather than overlooking or failing to give the Government's construction the "great weight" it merited, the Court went to great lengths to acknowledge its recognition of the Government's position and to accord it appropriate consideration and respect. That the Court did not at that particular point in its Decision incant specific talismanic words or signal references to the cases the Government cites does not in any way diminish from the substantive grade or quality of consideration the Court actually extended to the Government's contention in this regard. Insofar as it may not be absolutely clear from the Decision that the Court took full account of the Government's argument and accorded its reading of the Vienna Convention the prescribed great weight, the Court here reaffirms that in deciding as it did it was mindful of the pertinent rule of construction, and that had it not applied the relevant standard in the Decision, upon any reconsideration it would reach the same conclusion.

In fact, in its analysis of the inviolability issue, the Court expressed full cognizance of both the proper rule of treaty interpretation and of the specific authorities the Government cites. Immediately preceding its discussion of inviolability, in the section of the Decision concerning the application of Section 11 of the Vienna Convention, the Court expressed its recognition of the relevant standard and case law and actually invoked them, assigning the Government's construction of Section 11 the "great weight" to which it was entitled. *See Tachiona*, 169 F.Supp.2d at 302 n. 186 (citing *Sumitomo*, 457 U.S. at 184–85, 102 S.Ct. 2374; *Kolovrat*, 366 U.S. at 194, 81 S.Ct. 922, 6 L.Ed.2d 218; and *767 Third Ave. Assocs.*, 988 F.2d at 301–02). By the same token, relying on common law doctrine and declining to exercise personal and subject matter jurisdiction over Mugabe and Mudenge, the Court similarly accorded binding recognition to the Government's reading of the concept of sovereign immunity as it applies to heads of state. Having already articulated the applicable decisional framework and case law guidance with respect to these issues, the Court did not deem it necessary to repeat them, relying instead on an extensive exposition of the Government's theory and arguments to convey the depth of consideration given to those views.

In this regard, the Court notes that in connection with the issues pertaining to head-of-state and diplomatic immunity, the Government filed a "Suggestion of Immunity" on behalf of Mugabe and Mudenge, the intercession that the Court honored. On the other hand, concerning Plaintiffs' action against ZANU–PF, the Govern-

ment's submission to the Court offered "advice" that the organization was not subject to Plaintiffs' suit because it was not properly served with process. That advice was grounded on the Government's interpretation that the term "inviolable" as used in Article 29 of the Vienna Convention shielded Mugabe and Mudenge from all service of process, even if intended to assert claims against ZANU–PF. The Court rejected the Government's reading of the scope of "inviolability" as not entitled to the same degree of deference for several reasons expressly or impliedly detailed in the Decision.

■ First, to the extent the Government's theory rests upon a construction and application of the Vienna Convention, its reliance is misplaced. The genesis and negotiating history of the Vienna Convention make clear that the purpose the treaty intended to address was the codification of rules governing diplomatic relations between sovereign states and the organization and functioning of permanent diplomatic missions in states with established relations. *See Report of the International Law Commission: Diplomatic Intercourse and Immunities,* U.N.G.A. 12 th Sess., Supp. 9, U.N. Doc. A/3623 (1957), *reprinted in* II Y.B. Int'l L. Comm'n 131, 133, U.N. Doc. A/CN.41 Ser. A/1957/Add. 1 (hereinafter "1957 Int'l L. Comm'n Report"). Furthermore, the legislative history of the Diplomatic Relations Act, 22 U.S.C. §§ 254a–254e, which was enacted as a "necessary complement"[5] to the Vienna Convention, and the views of leading commentators affirm the Court's view that, while the Vienna Convention rendered the contours of diplomatic privileges and immunities more precise, it did not explicitly make those same inroads with respect to head-of-state immunity.

By its express terms, the Vienna Convention, whose text derives from the 1957 Int'l L. Comm'n Report as subsequently refined, deals with the definition of the personal privileges and immunities conferred on accredited diplomats in order to "ensure the efficient performance of the functions of diplomatic missions as representing states." Vienna Convention, Preamble. Specifically, the treaty applies to diplomatic agents defined as "the head of the mission or a member of the diplomatic staff of the mission." Vienna Convention, Art. 1; *see also* Diplomatic Relations Act, 22 U.S.C. § 254a(1). While the Vienna Convention goes into precise detail as to the categories of diplomatic personnel eligible to receive varying degrees of immunity, nowhere in the text is there any mention of heads of state or foreign ministers, nor of the scope of privileges and immunities or defenses from territorial jurisdiction applicable to them. *See* Vienna Convention, Art. 37; Lord Gore–Booth, *Satow's Guide to Diplomatic Practice* 9 (Lord Gore–Booth ed., 5 th ed.1975) (hereinafter *"Satow's Guide"*). As to subjects not addressed, the treaty reaffirms that "the rules of customary international law should continue to govern questions not expressly regulated by the provisions of the present Convention." Vienna Convention, Preamble.

The legislative history of the Diplomatic Relations Act similarly provides little support for the State Department's position that its interpretation of the Vienna Convention controls the scope of immunity conferred upon heads of state and foreign ministers. While the voluminous reports, hearings and floor debates evince a rigid preoccupation with the problem of parking tickets and traffic accidents involving the foreign diplomatic corps stationed in the United States, the legislative history re-

**5.** 124 Cong. Rec. 26,717 (Aug. 17, 1978)   (statement of Sen. Sarbanes).

veals no discussion of immunity with respect to heads of state or foreign ministers. *See, e.g., Diplomatic Immunity: Hearing on S. 476, S. 477, S. 478, S. 1256, S. 1257, and H.R. 7819 Before Sen. Comm. on the Judiciary,* 95th Cong. 26–27 (1978) (statement of Rep. Joseph L. Fisher) ("My interest in diplomatic immunity was aroused by a tragic incident. . . . A young constituent was killed by an automobile driven by a chauffeur from a foreign embassy. The car carried no liability insurance, and the chauffeur had full immunity from our criminal and civil processes.").

When the legislators and participants specifically addressed the scope of the Vienna Convention, they carefully detailed the categories of diplomats covered, but noticeably refrained from any discussion of heads of state or foreign ministers. Thus, in critical questioning by the Senate Judiciary Committee of the Justice Department's Chief of Foreign Litigation, no reference to heads of state or foreign ministers appears:

> Senator METZENBAUM. Mr. Ristau, I would appreciate your advising us who under the convention would continue to retain complete immunity, who would have limited immunity, and who would have none at all.
>
> Mr. RISTAU. Mr. Chairman, the convention sets up three categories of diplomatic agents. In the first category are the ambassadors and the high-ranking members of a diplomatic mission. They are referred to in the convention as diplomatic agents. . . . The second category comprises: "members of the administrative and technical staff." . . . The third category are "members of the service staff."

*Id.* at 31–32. Thus, to the extent that the State Department attempts to rely on the Vienna Convention as a source of authority for its position on head-of-state immunity, that view of the Convention appears not to

have been in the minds of legislators and policy makers when enacting the complementary legislation to the United States' accession. The silence of the legislature with respect to the immunity of heads of state and foreign ministers in its discussions of the Vienna Convention strongly suggests that the scope of that treaty is accordingly limited to the categories of diplomats meticulously spelled out in the text of the treaty and the Diplomatic Relations Act. *See, e.g., Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) ("Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.").

This view on the scope of the Vienna Convention borne out in the legislative history is also reaffirmed by leading commentators on international law. Sir Arthur Watts, while acknowledging that some principles of the Vienna Convention may be relevant in defining the boundaries of head-of-state immunity, concludes that, "[i]n most respects the law relating to the position of Heads of States in international law is a matter of customary international law, evolving as and when occasion arises for State practice to be apparent. In particular, the law owes much of its development to decisions of municipal courts over the past century and a half." Sir Arthur Watts, *The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers,* 247 Collected Courses of the Hague Academy of International Law 9, 37–40 (1994) (hereinafter "Watts").

While diplomatic privileges and immunities receive the benefit of relatively precise delineation in the Vienna Convention, the view in this Circuit and others is that head-of-state immunity remains in flux.

*See Tachiona,* 169 F.Supp.2d at 277 ("[T]he Second Circuit and other courts concur only in that '[t]he scope of this [head-of-state] immunity is in an amorphous and undeveloped state.'") (citing *In re Doe v. United States,* 860 F.2d 40, 44 (2d Cir.1988) and *In re Grand Jury Proceedings, John Doe # 700,* 817 F.2d 1108, 1110 (4th Cir.1987)). Leading commentators on international law concur. *See, e.g.,* I Oppenheim's International Law, § 490, at 1070 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1992) ("The law relating to permanent diplomatic missions attained a considerable degree of certainty as customary international law and much of it is now contained in the Vienna Convention on Diplomatic Relations 1961...."); *BCCI: Criminal and Civil Acts: Hearing Before House Comm. on Banking, Finance, and Urban Affairs,* 103d Cong. (1993) (statement of Professor Joseph Dellapenna) ("What we are left with, then, is an amorphous doctrine whose very existence is not entirely settled and whose reach is almost completely uncertain. While the State Department continues to attempt to control the application of the notion of head of state immunity ... [w]hether courts should be bound by such 'suggestions' or should even pay much attention to them is far from clear, although courts certainly seemed inclined to do so.").[6]

In the few reported cases where the principles of diplomatic immunity and head-of-state immunity intersect, practitioners in other countries have also taken the view that the Vienna Convention did not expressly codify the law relating to heads of state. For instance, an attorney for the prosecution in the recent extradition case involving Senator Augusto Pinochet Ugarte argued in a statement incorporated in the decision of the House of Lords that: "No international agreement specifically provides for the immunities of a head of state or former head of state. However, under customary international law a state is entitled to expect that the head of state will enjoy a measure of immunity from the jurisdiction of the courts of other states. That immunity reflects the respect due to the dignity of the head of state but the extent of the immunity is uncertain." *Regina v. Bow Street Metropolitan Stipendiary Magistrate (Ex parte Pinochet Ugarte),* [2000] 1 A.C. 147, 155 (statement of Professor Christopher Greenwood).[7]

---

**6.** *See also* B.S. Murty, The International Law of Diplomacy: The Diplomatic Instrument and World Public Order 335 (1989) ("Since time immemorial, persons sent as diplomatic emissaries by an elite to another elite have been given some immunities and privileges, and these have been elaborated and given relative precision over time."); Jerrold L. Mallory, *Resolving the Confusion over Head of State Immunity: The Defined Rights of Kings,* 86 Colum. L.Rev. 169, 171 (1986) ("Moreover, head of state immunity must also be considered distinct from diplomatic immunity, although some overlap exists. Thus, determining the degree of immunity that attaches to foreign heads of state is problematic because current law regarding this immunity is ambiguous.") (hereinafter "Mallory").

**7.** The uncertain boundaries of head-of-state immunity are also reflected in variances within the range of state practice. Although states are broadly in agreement that heads of state should be accorded some immunity, they diverge with respect to the extent of such immunity. *See Tachiona,* 169 F.Supp.2d at 276 n. 63; *see also* Mallory, 86 Colum. L.Rev. at 177–78. Mallory notes the following disparities in state practice: The United Kingdom grants a "modified form of restrictive immunity" to heads of state, based on the concepts of sovereign and diplomatic immunity; France seems to recognize a greater degree of head-of-state immunity comparable to diplomatic immunity; and the former Soviet Union consistently adhered to a theory of absolute sovereign immunity. It would seem implausible, given the range of state practice, that the Vienna Convention somehow codified

The import of the Court's discussion of the negotiating history of the Vienna Convention, the legislative history of the Diplomatic Relations Act and the views of leading international scholars and practitioners is simple: the weight of authority fails to support the notion that the Vienna Convention determines the applicability of head-of-state immunity in this controversy, and therefore, the State Department's position that this Court failed to give due consideration to its "treaty" determination is untenable.

█ Leaving the Vienna Convention aside for the moment, the precise contours of the protection from assertions of foreign territorial jurisdiction over heads of state are not specifically spelled out in any other treaty or universally accepted instrument reflecting customary international law. As one leading treatise has noted: "The New York Convention on Special Missions of 1969 provides that heads-of-state leading a special mission shall enjoy 'the facilities, privileges and immunities accorded by international law to Heads of State on an official visit,' but it does not define in any detail these facilities, privileges and immunities." *Satow's Guide*, at 9. Accordingly, the Court, even if ascribing appropriate weight to the Government's view, did not feel obliged in its Decision to subscribe to a theory that does not derive from or follow clear treaty language, or to defer to the State Department's construction of a Convention that on its face does not apply to the particular circumstances before the Court.

Second, the Court noted that even if the Vienna Convention's principle of inviolability applied to Mugabe and Mudenge, the concept is not absolute. The textual guidance the treaty provides to the meaning of personal inviolability mentions only the head-of-state immunity with the degree of precision that the Government's position here

diplomatic agent's freedom from any form of arrest or detention and the receiving State's duty to treat him with respect and to take appropriate steps "to prevent any attack on his person, freedom or dignity." Vienna Convention, Art. 29. The International Law Commission's commentary on the draft article that served as the precursor to the Vienna Convention's provision on personal inviolability elaborates that "[b]eing inviolable, the diplomatic agent is exempted from certain measures that would amount to *direct coercion.*" 1957 Int'l L. Comm'n Report, at 138 (emphasis added).

In practice, as the Court observed, the cases which have addressed this provision have all dealt with various forms of coercive actions implicating the diplomats directly—and thus potentially interfering substantially with their persons or impeding their ability to perform their governmental or diplomatic functions—rather than actions aimed at private third parties with which the diplomats may be closely affiliated. *See Tachiona*, 169 F.Supp.2d at 304 n. 196 and accompanying text.

Moreover, the Court also pointed out that the Vienna Convention itself admits of exceptions to inviolability. Article 31 excludes from immunity from the civil and administrative jurisdiction diplomatic agents enjoy three types of cases, including "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Vienna Convention, Art. 31(c).

Each of the three specific exceptions permits an exercise of jurisdiction directly against the diplomatic agent who is himself named a party to an action involving some private transaction conducted in the re-

suggests.

ceiving state. To this extent, these recognized assertions of jurisdiction could create significant interferences with the diplomat's official functions and dignity. Nonetheless, the Vienna Convention permits the exercise of national jurisdiction to enable adjudication of acts not within the scope of the diplomat's governmental duties that relate to the complainant's claims. In the balancing of national and international interests, official and unofficial diplomatic acts and the rights of private versus governmental persons, the Convention recognizes exceptions where the equities tip in the direction of private parties asserting wrongs from unofficial acts and the interference with diplomatic responsibilities are thus minimized.

Here, Plaintiffs claimed that at the time Mugabe and Mudenge were served, the officials were attending a ZANU–PF event whose purpose was to raise private funds for and promote the organization's activities. Plaintiffs contended that this event did not encompass governmental functions. Insofar as its design was to garner financing and other support intended for a private entity, supplying ZANU–PF with the financial and political means with which to carry out the wrongful actions Plaintiffs alleged, the event arguably could be read to encompass a professional or commercial activity exercised in this country outside Mugabe's and Mudenge's official functions. Because authority interpreting or applying these provisions is sparse, the Court cannot conclude that the Government's reading of the Vienna Convention follows from clear treaty language, or from practice concerning which an accepted international consensus exists.

Third, if not founded on the Vienna Convention itself, the inviolability the Government seeks to confer upon Mugabe and Mudenge would derive, if at all, from the general scope of head-of-state immunity as it has developed under principles of customary international law and corresponding domestic jurisprudence. *See, e.g.,* Restatement (Third) of Foreign Relations Law, § 464, Reporter's Note 14 (1986). As stated above, however, no definitive statement exists in any international agreement or other authority defining the range of privileges and immunities—and thus the full meaning of inviolability—that apply to heads of state. While it may be argued that under some or most circumstances the reach of inviolability of heads of state should be coextensive with the parallel protections accorded to diplomatic agents under the Vienna Convention, that is not to say that reliable authority exists for the proposition that the international community has deliberated and passed upon the matter and reached an accepted consensus to this effect. In fact, it is conceivable that were the privileges and immunities extended to heads of state under customary international law to be codified in a treaty, circumstances may be defined to justify some distinctions in treatment of inviolability as between heads of state and diplomatic agents, just as, for example, differences exist in the scope of privileges and immunities enjoyed by accredited envoys under the Vienna Convention and those accorded to consular officers under the Vienna Convention on Consular Relations. *See generally* Watts, 247 Collected Courses of the Hague Academy of International Law at 40 ("Yet analogy is not always a reliable basis on which to build rules of law, and certain fundamental differences exist between an ambassador's circumstances and those of a Head of State."); Lori J. Shapiro, *Foreign Relations Law: Modern Developments in Diplomatic Immunity,* 1989 Ann. Surv. Am. L. 281, 296.

More to the point in the matter at hand, there is no evidence in the sparse authority that exists that, were the very narrow issue to be thoroughly examined, the inter-

national community, such as it is today, would converge around a consensus defining inviolability as effectively extending sovereign immunity to the acts of private parties acting in concert with government officials to commit gross violations of international human rights. In fact, if any trend emerges from recent developments in international law, it is precisely in the direction of heightened sensitivity to international human rights, less tolerance for the old barriers that shielded the sovereign's private wrongful conduct and greater relaxation of jurisdictional rules so as to facilitate vindication of individual rights against extreme misconduct violating international norms. *See Tachiona*, 169 F.Supp.2d at 278–80.

In any event, absent specific authority under customary international law for the theory and contours of inviolability the Government propounded as to heads of state, the Court regarded the Government's position as an expanded derivative of the common law doctrine of head-of-state immunity. Because the Court found that the precise scope of head-of-state immunity was still formative, subject to numerous open questions and unsettled doubts, it declined the invitation to enlarge the bounds of the principle to the limits the Government advised. *See Tachiona*, 169 F.Supp.2d at 304–05. On this point, the Court noted that "[n]othing in the evolution of the common law doctrine suggests that the exception also encompassed conferring upon the State Department the function of defining the full reach of the concept of inviolability as it pertains to heads-of-state." *Id.* In view of the flux, uncertainties and absence of settled law surrounding head-of-state immunity, the Court then concluded that these were matters for "reasoned judicial interpretation in the light of experience and by sound application of the emerging common law, rather than by reflexive expansion of the execu-

tive branch's categorical reading of a limited doctrinal exception." *Id.*

The Government also urges reconsideration on policy grounds. It argues that the Court's "failure to give deference to the Executive Branch's treaty interpretation is likely to interfere with the conduct of foreign affairs." Specifically, the Government contends that service of process on certain visiting foreign officials would significantly divert from the performance of their foreign relations functions. (Government's Memorandum, at 9.) Moreover, the Government asserts that foreign states will "protest efforts to subject their high officials to United States civil litigation when those officials visit our nation to attend to international affairs." (Reply Memorandum of Law in Support of the United States' Motion for Reconsideration, dated Dec. 18, 2001, at 8.)

The Decision considered these arguments. In response, the Court acknowledged that certain forms of actions and assertions of jurisdiction taken directly against foreign government leaders or diplomats not only clearly hinder the performance of their official duties but constitute affronts to the person and dignity of the officials. It was the Court's view, however, that these concerns do not arise to the same extent, if at all, when the service of process, as was the case in the matter at hand, is intended to confer jurisdiction concerning actions and parties collateral to the foreign officials' governmental functions and do not demand the officials' appearance in court or otherwise subject them to the court's compulsory powers. *See Tachiona*, 169 F.Supp.2d at 305–06. Thus, the Government's reference to "efforts to subject high officials to United States litigation" is unfounded.

In the instant case, for example, the Court stressed that it is ZANU–PF institutionally, and not Mugabe and Mudenge personally, to which the Court's jurisdic-

tion applies and which is called to answer the process served on Mugabe and Mudenge—who at that time were senior officers and agents of ZANU–PF, and were engaged in furthering the private organization's activities. *See id.* In the Court's analysis, in balancing the equities and weighing the policy considerations the Government cites, any potential interference with the foreign officials' governmental functions under these circumstances would be minimal compared to the more substantial advancement of the interests of justice achieved by enabling significant claims against the private entity to be adjudicated. *See id.*

■ The Court finds in the Government's position a troubling aspect that merits additional comment. The Court having given due consideration to the Government's views and "advice" regarding both head-of-state and diplomatic immunity and the concept of inviolability, as well as to its reading of an international treaty whose applicability here is at least arguable, the Government nonetheless appears to take issue and perhaps umbrage with the Court's disagreement with its "advice." Implicit in the Government's posture is that its concept of "great weight" necessarily must yield concurrence, in other words, that upon being handed the Government's proffered reading of an international agreement, the Court is obliged, at the risk of otherwise causing indignity and affront, to give binding effect to what the Government says the treaty means. If indeed this view reflects the Government's concept of "clear and binding rules of judicial construction of treaty terms," the Government equates deference to submission, and would conflate "great weight" with surrendered judicial independence. (Gov-

ernment's Memorandum, at 5.) Were this notion to prevail, the Court's constitutional role and discretion in treaty interpretation effectively would be reduced to that of a mere echo of the Government's perspective. It implies that in practice once the Government has proclaimed its reading of particular treaty provisions, the Court's sole judicial duty would be obeisance—to toe the official line and apply the prescribed construction. And should it miss the Government's cue and fail to get it right in the first instance, the Court would be bound to correct its error upon the Government's prompting reconsideration. This Court cannot accept such a proposition. Even in articulation the theory makes a mockery of constitutional separation of powers. Manifestly, its effectuation would spell doom for judicial independence.

## II. *MOTION TO INTERVENE*

By letter brief dated December 18, 2001, the Government moved to intervene in this matter pursuant to Rules 24(a) and (b) of the Federal Rules of Civil Procedure on the grounds of intervention as of right and permissive intervention, respectively. (*See* Government's Letter, dated Dec. 18, 2001 (hereinafter "Intervention Motion").) The Government expressly limited the purpose of its intervention to appealing certain aspects of the Decision after the pending inquest on damages and the entry of final judgment. The Court subsequently directed Plaintiffs to respond, which they did by letter on January 10, 2002. (*See* Plaintiffs' Letter, dated Jan. 10, 2002 (hereinafter "Intervention Opposition").) Taken together, the Court accepts these submissions as the formal motion to intervene and the Plaintiffs' opposition to the Government's motion.[8]

---

**8.** In general, Rule 24(c) requires the submission of a formal motion and supplemental pleadings in order to trigger the motion. Where, however, the position of the movant is apparent from other filings and where the opposing party will not be prejudiced, Rule 24(c) permits a degree of flexibility with tech-

■ Pursuant to Rule 24(a)(2), the Government contends that it has a right to intervene for the purpose of appeal in the pending litigation. Rule 24(a)(2) requires the movant to conclusively establish four criteria: "the applicant must (1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already adequately represented by existing parties." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir.2001) (citations omitted). Failure to meet any one of the above requirements justifies denial of the motion. *Id.*

■ Nevertheless, the test is a flexible and discretionary one, and courts generally look at all four factors as a whole rather than focusing narrowly on any one of the criteria. *See United States v. Hooker Chemicals & Plastics*, 749 F.2d 968, 983 (2d Cir.1984) ("The various components of the Rule are not bright lines, but ranges—not all 'interests' are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate, and there is no litmus paper test for timeliness. Application of the Rule requires that its components be read not discretely, but together."). In light of the unique issues raised by the present controversy and upon balancing all of the *Butler* factors, the Court finds that there are sufficient grounds to grant the application of the Government to intervene.

As to the threshold requirement of timeliness, Plaintiffs contend that the Government's motion is untimely because the Government has known of its alleged interest in the litigation at least as early as September 2000, when it first entered an appearance in this matter, and because intervention at this stage would unduly delay the proceedings and prejudice them. Although Plaintiffs are correct in their chronology, the Government's limited purpose application belies the untimeliness of its motion. If the Government sought to intervene in order to present evidence or take testimony, Plaintiffs would be correct that such a motion would likely be untimely. The Government moves, however, for the limited purpose of appealing certain aspects of the Decision.

In *United Airlines, Inc. v. Liane Buix McDonald*, 432 U.S. 385, 394, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), the Supreme Court held that the "critical fact" in assessing the timeliness of a motion to intervene for purposes of appeal turns on when, after the entry of final judgment, the applicant seeks to enter the litigation. In the present matter, the Court issued its Decision on October 30, 2001. Thereafter, the Government filed a motion for reconsideration on November 16, 2001, which was still pending when it submitted the present motion to intervene. Furthermore, although the Decision ruled on the merits of Plaintiffs' underlying default motion, final judgment cannot be entered until the inquest on damages is completed.

Under the circumstances, the Government's motion cannot be deemed untimely. Because it was filed before decision on the

nical requirements. *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 782 F.Supp. 870, 874 (S.D.N.Y.1991). Here, there is no question that the Government's position has been meticulously set forth in its Suggestion of Immunity and related briefs filed in conjunction with motion practice.

Consequently, the Government's presence in the pending litigation, and its position therein, come as no surprise to anyone. Therefore, the Court accepts the current submissions as constituting the motion to intervene and the Plaintiffs' opposition.

motion for reconsideration and before entry of final judgment, the Court finds that the motion to intervene for the limited purpose of appeal was properly filed within the time frame contemplated by Rule 24. Furthermore, the argument of undue delay and prejudice is unconvincing. Neither the Government's current application nor its prior involvement in the case has delayed the Court's consideration of the merits, and an appeal by any party can hardly surprise opposing counsel.

The interest requirement, however, is more complex and nuanced. The plain language of Rule 24(a)(2) requires the Government to establish an interest "relating to the property or transaction which is the subject of the action." Fed. R.Civ.P. 24(a)(2). Plaintiffs claim that the Government has "no defensible interest relating to the property or transaction that is the subject of plaintiffs' private claims against ZANU–PF, a private entity." (Intervention Opposition, at 2). It is true that the underlying action concerns a claim for monetary damages against a private entity in Zimbabwe for alleged human rights abuses. Therefore, the Government's primary asserted interest— "fundamental issues of international comity and the conduct of foreign affairs"— appears to be unrelated to any subject in

dispute between the parties. (Intervention Motion, at 2.) The Government's interest in the matter, as framed above, does not implicate any cognizable property right, and the critical transactions or events at issue in the underlying action concern allegations of gross violations of international human rights law committed in Zimbabwe.

The Court's discussion should not be mistaken for the proposition that the Government's interests are unimportant. As stated, the Government's interests touch upon matters of international comity and United States foreign relations which are of vital importance from a constitutional and public policy perspective. The issue, however, is whether the Government's statement of interests amounts to "interest" as narrowly tailored in Rule 24(a)(2).

The failure to meet the textual requirements of "interest," however, will not automatically dispose of a motion to intervene. Some courts and commentators have advanced the notion that where a case implicates substantial and important issues of public law, the interest requirement may be applied less rigidly. *See, e.g., Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967) (State of California permitted to intervene in antitrust action where State had a strong interest in framing divestiture decree); 6 Moore's Federal Practice § 24.03[2][c] (3d ed.1997).[9] Be-

---

**9.** The Court recognizes that the *Cascade* decision has been the subject of robust criticism, and several subsequent decisions have narrowly tailored the decision to its unique facts. *See Hooker Chemicals,* 749 F.2d at 986 n. 15 (citation omitted) (*"Cascade* has come to be regarded as an extraordinary case, occasioned by the Court's 'splenetic displeasure' with the government's lack of diligence in seeking relief."); *United States v. International Business Machines Corp.,* No. 72 Civ. 344, 1995 WL 366383, *2 (S.D.N.Y. June 19, 1995) (*"Cascade* involved an extraordinary situation—not present in the instant action—which persuaded the Supreme Court to take the unusual step of permitting third parties to intervene in a government antitrust ac-

tion.... Subsequent antitrust decisions, however, establish that *Cascade* has been accorded little precedential weight."). This Court recognizes the disagreement over the precedential value of *Cascade* and the unique facts on which the Supreme Court based its decision. Nevertheless, the fact that applicants under Rule 24(a)(2) may, under compelling circumstances, plausibly state a substantial interest touching on an issue of public concern survives the criticisms of *Cascade.* Furthermore, the Government's role in this case, as discussed above, is materially different from private antitrust plaintiffs seeking to preserve some competitive advantage that might inure to their benefit.

cause of the unique facts underlying the present matter and the substantial public policy issues implicated therein, the Court finds that the Government's interests may be characterized as sufficiently strong to sustain a motion to intervene.

First, it would be entirely untenable to assert that the Government's interests in this matter are minimal. Rather, the importance of the Government's interests here are confirmed by the procedural mechanism, endorsed by statute and case law and implemented in this case, of accepting a Suggestion of Immunity from the Government.[10] This Court's acceptance of this procedural mechanism was an outright recognition that the Government was not only interested in this matter from a philosophical standpoint, but also that its interests were inextricably linked to the controversy in such a way that the Court should entertain a formal submission from the Government and, with respect to some claims, accord great weight to its views. Thus, by virtue of this procedural device, the interest analysis must begin with the recognition of the Government's rightful place in this dispute.

Second, it is relevant that the Government has both specific and general interests that overlap. The sequence of events leading up to the Decision began with the service of process upon Mugabe and Mudenge. Because all defendants failed to answer or respond in any way, Plaintiffs moved for a default judgment, which the Court granted as to ZANU–PF. The Government takes issue with that aspect of the Decision, claiming that the service of process on Mugabe and Mudenge was defective for the reasons discussed in Part I,

*supra.* In light of these events, the Government's interests are implicitly two-fold: the Government may be said to have a specific interest in quashing the service of process on Mugabe and Mudenge because of its purported interference with United States foreign relations vis-a-vis Zimbabwe; and the Government may have a broader interest, the one more clearly advanced by counsel, in fashioning a rule of law that does not jeopardize international comity or foreign relations with other visiting heads of state. Viewed this way, both the specific and general interests provide a sound basis for intervention for the limited purpose of appeal.

Finally, the Court notes that the Government's interests are not merely sanctioned by statute, case law and public policy considerations. The Government's right to be heard here has an additional constitutional underpinning. The United States Constitution does not expressly or exclusively grant authority to conduct foreign relations to any one branch of the Government, but it is beyond dispute that under Article II, section 2 and other statutory and common law provisions, the Executive Branch, acting through its subsidiary agencies, has substantial responsibilities with regard to this country's foreign relations. Taking into account all of these factors, the Court finds that the unique circumstances presented here and the Government's express and implied interests support a basis for intervention.

As to the remaining criteria, the Court finds no substantial dispute. The conduct of the named defendants, or lack thereof, leaves no doubt as to the inadequacy of the

---

10. Diplomatic Relations Act, 22 U.S.C. § 254d. § 254d states: "Such immunity may be established upon motion or suggestion by or *on behalf of* the individual, or as otherwise permitted by law or applicable rules of procedure." *Id.* (emphasis supplied). By practice and tradition, only the Government enters

suggestions of immunity on behalf of eligible individuals. *See Jungquist v. Nahyan,* 940 F.Supp. 312, 321–22 (D.D.C.1996) ("In sum, the determination of a diplomat's status as such is made by the State Department, not the Court.") (citations omitted), *rev'd on other grounds,* 115 F.3d 1020 (D.C.Cir.1997).

representation of their interests. Because defendants have deliberately chosen to ignore the Plaintiffs' grievances in this action, the service of process upon them and the motion for judgment against them, the only opposition to Plaintiffs' claims has come from the Government. Furthermore, in light of the Court's discussion of substantial interests above, the Court also finds that the Government is in fact situated in such a way that the ultimate disposition of this case could affect those Government interests. A decision affecting, as perceived by the Government, the treatment of heads of state or foreign ministers visiting the United States, particularly under the circumstances present here, may have some potential to implicate United States foreign relations in a manner that the Government could legitimately seek to mitigate by appeal of this Court's Decision.

Having established the four criteria set forth in *Butler,* the Court grants the Government's motion to intervene pursuant to Rule 24(a)(2) for the limited purpose of appeal.

### *CONCLUSION AND ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the Government's motion for reconsideration of the Court's Decision and Order dated October 30, 2001 is DENIED; and it is further

**ORDERED** that the Government's motion to intervene for the limited purpose of appealing the Decision is GRANTED.

**SO ORDERED.**