Adella CHIMINYA TACHIONA, on her own behalf and on behalf of her late husband, Tapfuma Chiminya Tachiona, and on behalf of all others similarly situated, Efridah Pfebve, on her own behalf and on behalf of her late brother Metthew Pfebve, Elliot Pfebve, on his own behalf and on behalf of his brother Metthew Pfebve, Evelyn Masaiti, on her own behalf, and Maria Del Carmen Stevens, on her own behalf and on behalf of her late husband David Yendall Stevens, and on behalf of all others similarly situated, Plaintiffs,

v.

Robert Gabriel MUGABE, in his individual and personal capacity, Zimbabwe African National Union–Patriotic Front, Stan Mudenge, Jonathan Moyo, and Certain Other Unknown Named Senior Officers of Zanu–PF, Defendants.

No. 00CIV6666VMJCF.

United States District Court, S.D. New York.

Aug. 7, 2002.

Paul B. Sweeney, Hogan & Hartson L.L.P., New York, NY, Theodore M. Cooperstein, Theodore M. Cooperstein, PC, Washington, DC, for plaintiffs.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Adella Chiminya Tachiona, Tapfuma Chiminya Tachiona, Efridah Pfebve, Elliot Pfebve, Evelyn Masaiti and Maria Del Carmen Stevens (collectively, the "Plaintiffs") commenced the present action against President Robert Mugabe ("Mugabe") and several other high-ranking government officials of Zimbabwe, as well as against the Zimbabwe National Union–Patriotic Front (the "ZANU–PF" or the "Defendant"), that country's ruling party. The complaint alleges that the named defendants committed torture, extra-judicial killings and other atrocities that violated Plaintiffs' fundamental rights under international human rights law.

In a Decision and Order dated October 30, 2001, this Court dismissed the claims asserted against Mugabe and the other Zimbabwe officials for lack of jurisdiction. See Tachiona v. Mugabe, 169 F.Supp.2d 259 (S.D.N.Y.2001) ("Tachiona I"). Nevertheless, the Court found that Plaintiffs had properly effected service of process on ZANU–PF through personal service on Mugabe, who also serves as ZANU–PF's titular head. See id. at 308. Defendant failed to appear in the case and a default judgment was entered against it. See id. The United States (the "Government") then filed a motion for reconsideration (United States of America's Motion for Reconsideration, dated Nov. 16, 2001 (the "Government's Motion")), which this Court denied on February 14, 2002. Tachiona v. Mugabe, 186 F.Supp.2d 383 (S.D.N.Y.2002) ("Tachiona II").

The Court then referred the action to Magistrate Judge James C. Francis IV for an inquest on damages for which Defendant again failed to appear. Presently before the Court is the Report and Recommendation of Magistrate Judge Francis, dated July 1, 2002 (the "Report"). Based solely on the allegations and evidence offered by Plaintiffs, the Report recommends that the Court find ZANU–PF liable for each claim and award damages accordingly. The Report is attached and incorporated hereto.

■ The Court has reviewed each of the issues raised in the case and the Report's analyses and conclusions with respect to each issue.[1] For the reasons set forth below, the Court is inclined to adopt the factual findings in the Report and the determination of liability and damages for torture and extra-judicial killing under the Torture Victim Protection Act, Pub.L. No. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 Note) (the "TVPA"). How-

---

1. The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(C). To accept recommendations to which no timely objections have been made, this Court must determine that they are not clearly erroneous. See id.; Counts v. Por-

tuondo, No. 97 Civ. 3305, 2002 WL 562646, at *1 (S.D.N.Y. Apr.16, 2002). The Court must review de novo any recommendations to which either party has filed timely objections. See 28 U.S.C. § 636(b)(1)(C); Counts, 2002 WL 562646, at *1 (citing United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997)).

ever, the Court reserves decision on the Report's findings with respect to Plaintiffs' claims pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350 (the "ATCA"). Furthermore, Plaintiffs may elect one of two alternatives: (1) a finding of liability and an award of damages solely for their claims under the TVPA; or (2) the submission of supplemental briefs further substantiating the legal basis for their claims under the ATCA.

## I. FACTUAL BACKGROUND

Plaintiffs alleged that ZANU–PF, in an effort to suppress political opposition, and acting in concert with Mugabe and other high-ranking Zimbabwe government officials, carried out a campaign of violence against them that included extra-judicial killing, torture, seizure of property and terrorizing. The Report reviews in great detail the facts as alleged by each of the Plaintiffs. Furthermore, on April 25, 2002, Magistrate Judge Francis held an inquest hearing during which Plaintiffs testified under oath about the underlying events giving rise to their claims. (*See* Report, at 3–13.) Having reviewed the record, the Court is inclined to adopt the factual findings set forth in the Report. Specifically, the Court adopts the factual findings in the Report relating to the numerous, credible accounts of violence and terror perpetrated against Plaintiffs by ZANU–PF operatives.

Plaintiffs seek compensatory and punitive damages for the following claims, which they bring under the ATCA: (1) extra-judicial killing in violation of both the TVPA and fundamental norms of international human rights law; (2) torture in violation of both the TVPA and fundamental norms of international human rights law; (3) the use of terror and violence to violate freedom of thought, freedom of political opinion and freedom to exercise political franchise in violation of fundamental norms of international human rights law;

(4) the use of terror and violence to violate freedom of association in violation of fundamental norms of international human rights law; (5) cruel, inhuman and degrading treatment in violation of fundamental norms of international human rights law; (6) racial discrimination in violation of fundamental norms of international human rights law; and (7) the unlawful seizure or destruction of property in violation of fundamental norms of international human rights law and the laws of Zimbabwe.

## II. DISCUSSION

### A. JURISDICTION

#### 1. Personal Jurisdiction

As established in its earlier decisions in this case, this Court has personal jurisdiction over the Defendant. *Tachiona I*, 169 F.Supp.2d at 309; *Tachiona II*, 186 F.Supp.2d at 384–93. The Court notes that the United States Attorney for the Southern District of New York has filed objections to the Report (United States of America's Objections to the Report and Recommendation on Damages, dated July 15, 2002 (the "Objections")), in which it reiterates the arguments on jurisdiction that it raised at the outset of this litigation and in its motion for reconsideration. (*See id.;* Government's Motion.) The Government asserts that this Court erred in holding that Plaintiffs properly served process on ZANU–PF through service of process on Mugabe and another high-ranking government official of Zimbabwe. (*See* Objections, at 2.) It argues that these individuals each "possessed inviolability by virtue of their head of state immunity and pursuant to applicable treaties." (*Id.*) The Government has again raised this issue in order to preserve it for appeal. Based on the reasoning set forth in its prior decisions, the Court finds no grounds to reconsider its ruling on personal jurisdiction and the efficacy of service of process on ZANU–

PF. *See Tachiona I,* 169 F.Supp.2d at 309; *Tachiona II,* 186 F.Supp.2d at 384–93.

## 2. *Subject Matter Jurisdiction*

 As established in its earlier decisions in this case, the Court has subject matter jurisdiction over Plaintiffs' claims of torture and extra-judicial killing, which they bring under both the ATCA and the TVPA.[2] *See Tachiona I,* 169 F.Supp.2d at 309–16; *Tachiona II,* 186 F.Supp.2d 383. With the possible exception of seizure of property, the Court is inclined to find subject matter jurisdiction over each of Plaintiffs' remaining ATCA claims as well.

 The ATCA provides for jurisdiction over claims (1) brought by aliens (2) alleging torts (3) committed in violation of the law of nations or a treaty of the United States.[3] *See Kadic,* 70 F.3d at 239; *Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386, 2002 WL 319887, at *3 (S.D.N.Y. Feb.28, 2002). Plaintiffs are all citizens of Zimbabwe and have alleged well-recognized torts. The only question remaining is whether each of these torts violates international law.

Neither party briefed the Court on the elements necessary to establish that a particular claim constitutes a violation of international law, creating jurisdiction under the ATCA. The Court, therefore, expresses its preliminary view that Plaintiffs' claims, with the exception of expropriation of property, properly allege violations of international law.

 A norm of international law must be specific, universal, and obligatory. See *Wiwa,* 2002 WL 319887, at *5 (citing *Doe v. Unocal Corp.,* 110 F.Supp.2d 1294, 1304 (C.D.Cal.2000)). A norm is universal and obligatory if: "(1) no state condone[s] the act in question and there is a recognizable 'universal' consensus of prohibition against it; (2) there are sufficient criteria to determine whether a given action amounts to the prohibited act and thus violates the norm; [and] (3) the prohibition against it is non-derogable and therefore binding at all times upon all actors." *Id.* (citing *Xuncax v. Gramajo,* 886 F.Supp. 162, 184 (D.Mass. 1995)).

 Although Plaintiffs have not comprehensively substantiated their claims as violations of international law, the Court's independent review of the legal landscape has uncovered some authority for subject matter jurisdiction over most of these claims. *See, e.g., Bigio v. Coca–Cola Co.,* 239 F.3d 440, 448–49 (2d Cir.2000) (citing the Restatement (Third) of Foreign Relations Law of the United States § 702(f) and indicating that international law prohibits systematic racial discrimination committed by a state actor but does not prohibit seizure of the property of its citizens within its borders); *Wiwa,* 2002 WL 319887, at *12 (holding that cruel, inhuman

---

**2.** While the ATCA is jurisdictional in nature and does not expressly delineate a substantive cause of action, the TVPA provides a substantive cause of action but does not itself confer federal jurisdiction. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 104 (2d Cir.2000) ("While the [ATCA] expressed itself in terms of a grant of jurisdiction to the district courts, the [TVPA] makes clear that it creates *liability under U.S. law* ....") (emphasis in original); *Kadic v. Karadzic,* 70 F.3d 232, 246 (2d Cir. 1995). As in this case, plaintiffs who bring claims under the TVPA often rely on the ATCA to provide jurisdiction. *See Kadic,* 70 F.3d at

246. Because Plaintiffs have established subject matter jurisdiction over their claims of torture and extra-judicial killing under the ATCA, this Court has subject matter jurisdiction over Plaintiff's TVPA claims as well. *See Tachiona I,* 169 F.Supp.2d at 309–316; *Kadic,* 70 F.3d at 246.

**3.** The full text of the ATCA reads: "The district courts shall have jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

and degrading treatment and the use of terror to prevent freedom of association violate customary international law). The Court has not, however, found compelling grounds to recognize the taking of property by a sovereign government from its citizens, as asserted here, as a violation of international law. Although there is the theoretical possibility of exercising pendent jurisdiction over this claim, the Court remains unconvinced that it should do so here.

## B. LIABILITY AND DAMAGES UNDER THE TVPA

█ The Court is inclined to adopt the Report's finding of liability under the TVPA. (*See* Report, at 14–17). The TVPA provides that "an individual who, under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to torture . . . or (2) subjects an individual to extra-judicial killing" shall be liable for damages. 28 U.S.C. § 1350 Note, at § 2(a). Because the facts as alleged establish Defendant's liability under the TVPA for both torture and extra-judicial killing, Plaintiffs' rights to damages flow from the TVPA itself. *See* 28 U.S.C. § 1350 Note.

█ While requiring a damage award for successful plaintiffs, the language of the TVPA provides no methodology for determining the amount or type of these damages. *See id.* The Court therefore is inclined to find that the Report appropriately relied on federal common law to do so.[4] (*See* Report, at 23–26.) As one court noted, "[b]ecause Congress in the TVPA offered no methodology as to how damages should be determined, federal courts are free to and should create federal common law to provide justice for any injury contemplated by the Alien Tort

Statute and the TVPA or treaties dealing with the protection of human rights." *In re Estate of Marcos*, 910 F.Supp. 1460, 1469 (D.Haw.1995) (citing *Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) ("Some [problems] will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("[A]n issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law.")). As regards the TVPA, the federal common law concerning damage awards allows for both compensatory and punitive damages in the amounts requested by Plaintiffs.

Courts in this and other circuits have awarded substantial compensatory and punitive damages to plaintiffs claiming torture and extra-judicial killing under the TVPA. *See Mushikiwabo v. Barayagwiza*, No. 94 Civ. 3627, 1996 WL 164496, at *3 (S.D.N.Y. Apr.9, 1996) (awarding compensatory damages including $500,000 in pain and suffering and awarding $1,000,000 in punitive damages to each relative of a victim and $5,000,000 to each victim for torture and murder under the TVPA and ATCA); *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1358–60 (N.D.Ga.2002) (awarding $10,0000,000 in compensatory and $25,000,000 in punitive damages to each victim for torture, cruel and inhumane treatment, arbitrary detention, violations of the law of war and crimes against humanity under both the TVPA and

4. Although, as discussed below, the Court notes that the Report may have inappropriately combined its analysis of damages available under the TVPA with that of damages available under the ATCA.

268

ATCA; as well as assault and battery, false imprisonment, intentional infliction of emotional distress and conspiracy under Georgia law); *Xuncax*, 886 F.Supp. at 198–200 (awarding $3,000,000 in compensatory damages to one victim but declining to award punitive damages because the torture and murders had occurred prior to the passage of the TVPA). Therefore, the Court is inclined to adopt the Report's recommended award of $2,500,000 in compensatory and $5,000,000 in punitive damages for extra-judicial killing and $1,000,000 in compensatory and $5,000,000 in punitive damages for torture for each plaintiff.

## C. *LIABILITY AND DAMAGES UNDER THE ATCA*

■ In addition to bringing claims for torture and extra-judicial killing under the TVPA, Plaintiffs also bring each of their seven claims under the ATCA.[5] As noted above, this statute provides jurisdiction over claims brought by aliens that allege torts in violation of international law, but it does not indicate what substantive law courts should apply in determining liability and damages. *See* 28 U.S.C. § 1350. The Second Circuit recently pointed out that there is significant disagreement among various circuits on this issue, noting that "the federal courts have never definitively resolved this choice-of-law question."

*Wiwa*, 226 F.3d at 105 n. 12 (citing *Xuncax*, 886 F.Supp. at 180–83 (holding that international law provides the substantive law for ATCA claims); *In re Estate of Ferdinand Marcos*, 978 F.2d 493, 503 (9th Cir.1992) (approving the district court's use of the tort law of the state where the underlying events occurred); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 777, 781–82 (D.C.Cir.1984) (Edwards, J. concurring) (suggesting that tort laws of the forum state might supply the substantive law for ATCA claims); *Filártiga v. Pena–Irala*, 630 F.2d 876, 889 (2d Cir.1980) (requiring choice-of-law analysis)).

■ The controlling case in this Circuit is *Filártiga*, which requires the Court to perform a choice-of-law analysis, following the standards articulated in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), to determine the substantive law for ATCA claims.[6] *See Filártiga*, 630 F.2d at 887–89 (construing the ATCA "not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law"). Because all of the parties to the instant action are citizens of Zimbabwe and all of the events took place in Zimbabwe, the Court must first look to the laws of Zimbabwe in adjudicating Plaintiffs' ATCA claims.[7] *See Lauritzen*, 345 U.S. 571, 73 S.Ct. 921 (listing seven factors to be used

5. The fact that Plaintiffs brought the extra-judicial killing and torture claims under the TVPA does not mean that they cannot also bring them under the ATCA. *See Wiwa*, 2002 WL 319887, at *4 (citing *Kadic*, 70 F.3d at 239 ("[T]he scope of the ATCA remains undiminished by enactment of the TVPA" and plaintiffs may bring claims under both.)).

6. The only other case in this Circuit to reach the merits on and award damages for claims brought under the ATCA (and TVPA) was *Mushikiwabo*, 1996 WL 164496. Although the circumstances of the case were similar to those of the instant case, i.e. plaintiffs brought claims against the leader of a political party,

and the court entered a default judgment, the decision provides no indication of how the court chose the substantive law to apply.

7. The Second Circuit did not dictate what courts should do if the substantive law they are required to apply fails to provide an appropriate remedy:

Should the district court decide that the Lauritzen analysis requires it to apply Paraguayan law, our courts will not have occasion to consider what law would govern a suit under the Alien Tort Statute where the challenged conduct is actionable under the law of the forum and the law of nations, but

in performing the choice-of-law analysis for a maritime claim: (1) place of wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant; (5) place of contract; (6) inaccessibility of foreign forum; (7) the law of the forum); *see also Filártiga,* 577 F.Supp. at 864 (applying Paraguayan law to plaintiffs' ATCA claims because (1) all of the events took place in Paraguay; (2) all of the parties lived in Paraguay when the events took place; (3) the parties' relationships with each other were centered in Paraguay; and (4) Paraguayan law prohibits torture).

While this Court may hear claims arising under foreign law, *see, e.g., Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 637 (S.D.N.Y.2000), the Plaintiffs have neither performed the appropriate choice-of-law analysis nor clearly substantiated their claims in connection with that analysis. Therefore, in the interest of fairness to all parties, the Court requests that they provide additional briefs analyzing the applicable law of Zimbabwe underlying the ATCA claims. In the alternative, Plaintiffs may choose to accept the award of damages for the claims under the TVPA.

### III. CONCLUSION AND ORDER

Accordingly, it is hereby

**ORDERED** that Plaintiffs shall inform the Court by letter no later than August 21, 2002, whether they intend to submit additional briefs on the issues set forth above. If Plaintiffs elect to submit additional briefs, their letter shall also set forth a proposed briefing schedule.

If, however, Plaintiffs elect to forego additional briefing and accept the award of damages under the TVPA, the Court shall promptly enter judgment accordingly.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

FRANCIS, United States Magistrate Judge.

The plaintiffs,[1] Adella Chiminya Tachiona, Tapfuma Chiminya Tachiona, Efridah Pfebve, Metthew Pfebve, Elliot Pfebve, Evelyn Masaiti, Maria Del Carmen Stevens, and David Yendall Stevens ("plaintiffs"), bring this action against the Zimbabwe African National Union Patriotic Front ("ZANU–PF"), the Zimbabwe government's ruling political party.[2] The plaintiffs allege that the defendant, through its officers, planned and executed a campaign of violence designed to intimidate and suppress political opposition in violation of the Alien Tort Claims Act (the "ATCA"), 28 U.S.C. § 1350, the Torture Victim Protection Act (the "TVPA"), Pub.L. No. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 Note), and fundamental norms of international human rights law.[3] Specifically, the acts alleged

---

not the law for the jurisdiction in which the tort occurred.

*Id.* at 889. On remand, the district court performed a choice-of-law analysis and determined that it should apply Paraguayan law, which provides for compensatory damages. *Filártiga v. Pena–Irala,* 577 F.Supp. 860, 864 (E.D.N.Y.1984). The court also awarded punitive damages, which it deemed "essential and proper ... in order to give effect to the manifest objectives of the international prohibition against torture." *Id.* at 865.

1. Although the case was brought as a class action, class certification has not been grant-

ed, and this Report and Recommendation will therefore only address the claims of the eight named plaintiffs.

2. The claims against defendants Robert Mugabe, Stan Mudenge, and Jonathan Moyo were dismissed based on principles of sovereign and diplomatic immunity. *See Tachiona ex rel. Tachiona v. Mugabe,* 169 F.Supp.2d 259 (S.D.N.Y.2001).

3. The complaint alleges violations of "among others, the 1949 Geneva Conventions, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punish-

by the plaintiffs include: (1) politically motivated, extrajudicial killing; (2) torture; (3) the use of terror and violence to violate freedom of thought and political opinion; (4) the use of terror and violence to interfere with freedom of association; (5) cruel, inhuman, and degrading treatment; (6) racial discrimination; and (7) the unlawful seizure or destruction of property.

The complaint was properly served on the defendant, ZANU–PF, on September 8, 2000, through personal service on Robert Mugabe, its principal officer, but the defendant has failed to appear in the case. An order of default was entered on October 30, 2001, *Tachiona*, 169 F.Supp.2d 259, and a motion by the United States government for reconsideration of that order was denied on February 14, 2002, *Tachiona ex rel. Tachiona v. Mugabe*, 186 F.Supp.2d 383 (S.D.N.Y.2002). The action was then referred to me for a hearing on damages. Despite being notified of the inquest, the defendant failed to appear, and the following findings are therefore based exclusively on the evidence presented by the plaintiffs.

## Background

The plaintiffs are all citizens of Zimbabwe. The defendant, ZANU–PF, has been Zimbabwe's ruling party since 1980 and is controlled by its First Secretary and the President of Zimbabwe, Robert Mugabe. (Compl., ¶¶ 2, 21–25, 32). In January 2000, an opposition party, called the Movement for Democratic Change (the "MDC"), was formally launched. (Compl., ¶ 38). The plaintiffs allege that in response to this new political threat, ZANU–PF, through its officers, "organize[d] targeted violence against political opponents and their families and supporters, assassinations and assassination attempts, kidnap-

pings, tortures, rapes, beatings, mass destruction of property, and mob riots in a consistent and focused campaign of terror designed to crush political opposition to ZANU–PF." (Compl., ¶¶ 3, 41). In order to further consolidate power, President Mugabe and ZANU–PF began endorsing the illegal expropriation of farmland in Zimbabwe, the majority of which was white-owned. Consequently, many farm owners and farm workers became supporters of the MDC. (Compl., ¶¶ 39–40). The plaintiffs further allege that ZANU–PF organized and paid the Zimbabwe War Veterans' Association (the "ZWVA") to illegally occupy farms and wage a campaign of "violence and terror against farmers and the political opposition." (Compl., ¶¶ 4, 44–45). According to the plaintiffs, since June 2000, over 1,600 privately-owned farms have been illegally occupied or appropriated by ZANU–PF and ZWVA. (Compl., ¶¶ 53, 63).

Below is a brief description of the respective allegations of each plaintiff.

### A. Tapfuma Chiminya Tachiona

Tapfuma Chiminya Tachiona was a founding member of the MDC, the National Youth Organizer for the MDC, and a close companion of Morgan Tsvangirai, the President of the MDC. (Compl., ¶¶ 69–70; Tr. 96).[4] On April 15, 2000, while Mr. Chiminya was campaigning with Mr. Tsvangirai, a group of ZANU–PF supporters attacked them. Managing to escape, Mr. Chiminya drove injured colleagues to the hospital, after which he reported the incident to the police. (Compl., ¶¶ 71–77; Tr. 66–71). On his way home from the police station, he and two other MDC supporters, Sanderson Makombe and Talent

ment, United Nations Charter, Universal Declaration of Human Rights, and the International Covenant on Civil and Political Rights." (Complaint ("Compl."), ¶ 10).

4. "Tr." refers to the transcript of the inquest held on April 25, 2002.

Mabika, were again stopped by ZANU–PF members, who began attacking them with knives and sticks. Mr. Makombe was able to escape through the window of the vehicle and hid in the nearby brush, but Mr. Chiminya and Ms. Mabika remained trapped inside the truck as the assailants continued to beat them. Mr. Chiminya was hit repeatedly in the head with the butt of a gun, according to Mr. Makombe. (Tr. 74–81). At that point, the assailants doused the vehicle with gas, causing the whole truck to go up in flames. The attackers then jumped in their vehicle and fled, soon after which Mr. Chiminya and Ms. Mabika managed to tumble out of the burning truck. Mr. Chiminya "was just like a ball of flames running across the tarred road," according to Mr. Makombe. He ran toward a field and collapsed, but died before Mr. Makombe could reach him. (Tr. 82–84).

### B. *Adella Chiminya Tachiona*

Adella Chiminya Tachiona is the thirty-four year old widow of Tapfuma Chiminya Tachiona and a member of the MDC. (Compl., ¶¶ 21, 69; Tr. 101). She currently lives in England with her two children. (Tr. 90–92). At trial, Ms. Chiminya testified that she fled Zimbabwe out of fear for her safety because soon after her husband was killed, a ZANU–PF car began following her to and from her workplace and remained parked at the corner of her street for over two weeks. (Tr. 91, 100). She also testified that she spoke at MDC rallies after her husband was murdered and that violence broke out on two separate occasions. (Tr. 101). She further testified that since her husband's death she has experienced depression and medical complications including an ulcer and heart problems. Her poor health has prevented her from working and supporting her family. (Tr. 103–04). Ms. Chiminya has brought this action on behalf of herself and her late husband.

### C. *Elliot Pfebve*

Elliot Pfebve is the brother of Efridah Pfebve and the late Metthew Pfebve. A computer engineer by trade, he started his own business in 1997 which employed sixteen workers at its peak and serviced private companies as well as government institutions. (Tr. 14–16).

In February 1999, the plaintiff became involved in politics and helped establish the MDC. He stood as an MDC candidate for the Mashonaland Central Province in the Zimbabwe National Parliamentary elections in June 2000 and currently serves as an executive member. (Compl., ¶¶ 23, 92; Tr. 16, 18). During the time leading up to the parliamentary elections, the province experienced a dramatic increase in violence allegedly orchestrated by ZANU–PF members and supporters. (Compl., ¶¶ 93–97). The plaintiff was repeatedly attacked, received a number of death threats, and was the subject of several assassination attempts during this time. On February 20, 2000, Mr. Pfebve was scheduled to give a speech at a political rally. Over 150 youths turned up wearing ZANU–PF t-shirts and began attacking MDC supporters with iron bars, axes, rods, and spears. Mr. Pfebve was specifically informed that he was targeted for assassination, but because he had a firearm he was able to escape. (Compl., ¶¶ 99–100; Tr. 23–25). Several weeks later, a similar incident happened at another rally. Again Mr. Pfebve was able to escape harm by brandishing a firearm. (Compl., ¶¶ 103–04; Tr. 26–27). Although some of the ZANU–PF assailants were arrested, all were released without being charged. (Compl., ¶ 105; Tr. 28). In April 2000, a third incident occurred while the plaintiff was walking with two MDC supporters. The three were attacked by ZANU–PF supporters wielding knives. One person was stabbed several times and

left unconscious in the road. (Compl., ¶¶ 106–07; Tr. 28–29). A fourth incident also occurred in April 2000 after a political rally that the plaintiff attended. As Mr. Pfebve was driving away, he and other MDC supporters were attacked by hundreds of ZANU–PF supporters armed with sticks, axes, spears, stones, and firearms. The plaintiff was able to flee because he was in a vehicle, but others were seriously wounded, including his driver who lost an eye during the attack. (Compl., ¶¶ 109–10; Tr. 29–31). Finally, on April 29, 2000, while the plaintiff was campaigning elsewhere, over 300 ZANU–PF supporters attacked his family home. They beat his father, threw stones and bricks at his mother, and killed his brother, Metthew Pfebve, apparently believing that he was the plaintiff. (Compl., ¶ 112; Tr. 31–34). The plaintiff has since been informed that the purpose of the attack on his home was to assassinate him. (Compl., ¶ 120; Tr. 36).

At trial, Elliot Pfebve testified that he continues to fear for his life today. He asserted he is under twenty-four hour surveillance by ZANU–PF and that it has been "difficult to concentrate." (Tr. 42). He further testified that he feels traumatized by what has happened to himself and his brother. His business has suffered badly, losing seventy-five percent of its former clientele. Government institutions have withdrawn their business as have some of his private clients who fear reprisal from ZANU–PF for working with him. The landlord for his business recently evicted him after receiving threats from the defendant that the building would be destroyed unless the plaintiff's lease was terminated. (Tr. 42–43). The plaintiff testified that the loss to his business was approximately eight million Zimbabwean dollars, the loss to his property from the April 29 attack was approximately five hundred thousand Zimbabwean dollars, and the damage to his vehicles from both the April attack and other incidents totaled approximately four million two hundred thousand Zimbabwean dollars. (Tr. 43–44).

### D. Metthew Pfebve

As discussed above, on April 29, 2000, ZANU–PF supporters approached the Pfebve home wielding axes, spears, sticks, and stones. The Pfebve family ran in different directions. Metthew Pfebve's mother managed to run into the outhouse, but was eventually found and pelted with stones by the assailants. The plaintiff and his father were attacked with stones, sticks, and fists, and then dragged down the road. The plaintiff's father was eventually dropped unconscious on the road, suffering deep lacerations to his head and several broken fingers. Meanwhile, Metthew Pfebve was carried away by the assailants. He was found dead the next day, naked and lying in the middle of the road, approximately one and one-half kilometers from his home. He had been severely beaten. (Compl., ¶¶ 114–19; Tr. 34–35). The plaintiffs allege that he was in all likelihood tortured prior to his death at or nearby a primary school which the defendant had turned into a torture camp. (Compl., ¶¶ 122–25). His death certificate indicates that his death was caused by "1) massive brain injury from trauma; 2) assault; and 3) laceration of right lung." (Pl.Exh. 2).

### E. Efridah Pfebve

This plaintiff is the younger sister of Metthew and Elliot Pfebve. She was at her home with her family on April 29, 2000, when her family was attacked and her brother killed. She was attacked herself and witnessed her mother being stoned. (Compl.¶¶ 113–15). She sues on behalf of herself and on behalf of her late brother, Metthew. (Compl., ¶¶ 22, 91).

## F. *Evelyn Masaiti*

Ms. Masaiti stood as an MDC candidate in the elections in June 2000 and was elected as a member of parliament for the Mutasa District. During the period leading up to the elections, she was subjected to repeated acts of violence, attempted assassination, and terrorism. (Compl., ¶¶ 24, 126–29). On April 23, 2000, the plaintiff's vehicle was stoned by ZANU–PF supporters. (Compl., ¶ 130). The next day, as she and her husband were on their way to the police station to report the incident, ZANU–PF supporters stopped her and punched her in the face and head. As a result of the attack, Ms. Masaiti has suffered permanent hearing damage. (Compl., ¶¶ 131–32; Declaration of Evelyn Masaiti in Support of Judgment by Default ("Masaiti Decl."), ¶ 6, attached as Exh. 4 to Memorandum of Law in Support of the Motion for Judgment by Default ("Motion for Default Judgment")). On May 27, 2000, as she and several other family members were standing on the patio of their home, a bottle full of gasoline was thrown directly at them, exploding at their feet. Ms. Masaiti suffered cuts to her leg. (Compl., ¶¶ 135–36). Days later, on May 29, 2000, a mob of ZANU–PF supporters attacked and destroyed the plaintiff's vehicle and two homes by burning them to the ground. A third home was demolished two weeks later. All of the plaintiff's personal possessions were destroyed in the attack, as well as the three different structures and a granary which stored her family's maize crop for the entire year. Fortunately, she had been warned the day before about the planned attack and so managed to flee. (Compl., ¶¶ 138–40; Masaiti Decl., ¶¶ 14–15). Several of her family members, however, were severely injured in the attack. The plaintiff was later informed that the attack was meant for her. (Compl., ¶¶ 141–42). According to the plaintiff, her destroyed homes were valued at nine hundred thousand Zimbabwean dollars and the value of the maize supply was one hundred seventy-five thousand Zimbabwean dollars. (Masaiti Decl., ¶ 17; Motion for Default Judgment at 23).

## G. *David Yendall Stevens*

David Stevens and his wife, Maria, owned a private commercial farm in Zimbabwe. Mr. Stevens was a known supporter of the MDC. On February 12, 2000, their farm was invaded by twenty-six ZANU–PF and ZWVA members and supporters. After that initial invasion, there have been a number of incidents of violence. For example, on two occasions, several female farm workers were assaulted and on one occasion, one was raped. Complaints to the police went unheeded. (Compl., ¶¶ 148–52; Declaration of Maria Del Carmen Stevens in Support of Judgment by Default ("Stevens Decl."), ¶¶ 5–6, attached as Exh. 5 to Motion for Default Judgment). On April 15, 2000, ZANU–PF and ZWVA members killed the Stevens' dog and abducted David Stevens and five others. All six were severely beaten and tortured, and Mr. Stevens was forced to drink diesel oil. (Compl., ¶¶ 153–56).

Several of Mr. Stevens' neighbors observed the kidnapping and attempted to come to his aid by following his abductors to the police station. Once there, they were taken hostage as well, bound with rope, and driven away in two different vehicles. The men were tortured in a variety of ways, including being burned with cigarettes; beaten on the soles of their feet; beaten with rods, rocks, and iron bars; hit in the face; and whipped with a fan belt from a car. In addition, their legs were cut with knives and they were threatened with having their ears and testicles cut off. (Declaration of Stuart Gemmill in Support of Judgment by Default ("Gemmill Decl."), ¶¶ 2–24; Decla-

ration of Ian Hardy in Support of Judgment by Default, ¶¶ 2–13; Declaration of Stephanus Kenneth Krynauw in Support of Judgment by Default, ¶¶ 2–22, attached as Exhs. 7, 8, 9 to Motion for Default Judgment). Mr. Stevens was summarily executed later that same day. (Compl., ¶¶ 25, 157).

### H. *Maria Del Carmen Stevens*

Maria Stevens is the widow of David Stevens and the single mother of four children. She was a commercial farmer along with her husband, until their farm was taken over by ZANU–PF supporters in February 2000. (Compl., ¶¶ 148, 150; Stevens Decl. ¶ 2). A number of violent incidents occurred after the initial invasion, including the assault of a young farm girl referred to earlier. The plaintiff began fearing for her safety and that of her family, particularly after reports to the police were ignored. (Comp., ¶¶ 151–52; Stevens Decl., ¶¶ 4–5). She sues on her own behalf as well as on behalf of her slain husband. (Compl., ¶ 25).

### Discussion

### A. *Jurisdiction*

This Court has subject matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. § 1350. The defendant ZANU–PF is subject to personal jurisdiction because Robert Mugabe, the defendant's principal officer, was personally served while he was present in New York, *see* N.Y. C.P.L.R. § 301, and it has been established that ZANU–PF has sufficient minimal contacts with the forum state to satisfy the due process requirements for jurisdiction. *Tachiona*, 169 F.Supp.2d at 309; *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir.2000) ("Personal jurisdiction may be exercised only when (1) the State's laws authorize service of process upon the defendant and (2) an assertion of jurisdiction under the

circumstances of the case comports with the requirements of due process.").

### B. *Liability*

Following a default, all factual allegations of the complaint, except those relating to damages, must be accepted as true. *See Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir.1993); *Donoghue v. MIRACOR Diagnostics, Inc.*, No. 00 Civ. 6696, 2002 WL 233188, at *2 (S.D.N.Y. Feb.11, 2002). Here, the facts establish the plaintiffs' claims of extrajudicial killings, torture, and other atrocities in violation of the ATCA and the TVPA.

#### 1. *The Alien Tort Claims Act*

Under the ATCA, "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. To bring an action under the ATCA, three conditions must be satisfied: (1) the claim must be brought by an alien; (2) the alleged claim must be a tort; and (3) the tort must be committed in violation of the law of nations. *See Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995). The first two elements are plainly satisfied here. The plaintiffs are all Zimbabwean citizens and have alleged well-recognized torts. The third element is also presumed to have been satisfied since Judge Victor Marrero, in an earlier decision in this case, found that the atrocities alleged by the plaintiffs are violations of the law of nations and are therefore covered under the ATCA. *See Tachiona*, 169 F.Supp.2d at 310 ("the ordeals of torture, extrajudicial killings and other atrocities which Plaintiffs assert characterized the campaign of lawlessness and terror ZANU–PF inflicted upon them fall within the . . . violations of international law cognizable under the ATCA"). Thus, liability is established under the ATCA.

## 2. *The Torture Victim Protection Act*

Under the TVPA, liability is established when an individual, "under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to torture ... or (2) subjects an individual to extrajudicial killing." 28 U.S.C. § 1350 Note, at § 2(a). Torture is defined as,

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ..., whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining ... information or a confession, punishing that individual ..., intimidating or coercing that individual ..., or for any reason based on discrimination of any kind.

*Id.* at § 3(b). Extrajudicial killing is defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.* at § 3(a). The statute also requires that plaintiffs exhaust "adequate and available" local remedies and provides a ten-year statute of limitations. *Id.* at § 2(b) & (c).

Here, the plaintiffs have easily met the standards for torture and extrajudicial killing. Plaintiffs Metthew Pfebve and David Stevens were subjected to severe pain and suffering at the hands of the defendants before being brutally murdered. Tapfuma Chiminya Tachiona was also brutally murdered by ZANU–PF supporters. In addition, all of the alleged actions occurred within the last ten years, thus meeting the statute of limitations period. Finally, the plaintiffs have fulfilled the exhaustion requirement of the TVPA by demonstrating that the Zimbabwean judicial system is sufficiently under the control of President Mugabe, the principal officer of ZANU–PF, so as to render it inaccessible to the plaintiffs. According to the plaintiffs, President Mugabe has disregarded a number of Zimbabwean High Court rulings in regard to the illegal farm occupations and has continued to publicly encourage the takeovers and the accompanying violence. (Compl., ¶¶ 162–64). In addition, the Law Society of Zimbabwe prepared a petition of complaints similar to the ones presented here and attempted to present it to the President. They were told that no such petition would be accepted. Additionally, complaints to local police stations have been ignored as the police have been ineffective in combating the violence against the plaintiffs and at times complicit in it. (Compl., ¶ 166). *See Xuncax v. Gramajo,* 886 F.Supp. 162, 178 (D.Mass.1995) (exhaustion not generally required under TVPA "when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile").

The language of the TVPA also makes clear that the plaintiff "must establish some governmental involvement in the torture or killing to prove a claim." *Kadic,* 70 F.3d at 245 (quoting H.R.Rep. No. 102–367, at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87). That requirement is also easily met here. According to Judge Marrero's earlier decision, the plaintiffs assert "involvement [and] significant assistance by high-ranking Zimbabwe government officials in ZANU–PF's campaign of torture and summary killings." *Tachiona,* 169 F.Supp.2d at 316. In addition, "[t]he underlying unlawful and injurious campaign carried out by ZANU–PF ... allegedly employed government equipment and facilities such as transportation, communications and coordination, and were under the command of Zimbabwe's Air Force at the behest of Mugabe." *Id.* Accordingly, liability under the TVPA has also been established.

## C. *Damages Requested*

The plaintiffs seek an award consisting of both compensatory and punitive dam-

ages. They are entitled to both under the ACTA and the TVPA. *See Xuncax,* 886 F.Supp. at 198–99; *Filartiga v. Pena–Irala,* 577 F.Supp. 860, 865–66 (E.D.N.Y. 1984). In determining the amount of punitive damages, the court must consider a variety of factors including the "nature of the acts." *Filartiga,* 577 F.Supp. at 866 (citing *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974)).

> Chief among the considerations the court must weigh is the fact that this case concerns not a local tort but a wrong as to which the world has seen fit to speak. Punitive damages are designed not merely to teach a defendant not to repeat his conduct but to deter others from following his example.

*Id.* at 866 (citing *Zarcone v. Perry,* 572 F.2d 52, 55 (2d Cir.1978)). Given the terrible acts of cruelty alleged by the plaintiffs in this case, substantial punitive awards are justified.

In addition to the nature of the act, a court should also consider the defendant's assets, "but the burden is on the defendant to show his modest means if he wishes them considered in mitigation." *Filartiga,* 577 F.Supp. at 866 (citing *Zarcone,* 572 F.2d at 56). Here, although not required, the plaintiffs have submitted evidence illustrating that ZANU–PF and its officers have significant assets around the world. ("Interview Notes Summary Asset Ownership Study" by Martin Hanratty dated Nov. 14, 2000 attached as Exh. 2 to Pl. Exh. 7). Since the defendant has defaulted, the Court has received no evidence to counter this and will award damages accordingly.

In their default judgment submission, the plaintiffs seek a minimum of $16,555,907 in compensatory damages and $52,000,000 in punitive damages. Specifically, they seek "in excess of" or "not less than" the following damages for each claim: [5]

*Claim # 1: Extrajudicial Killing*

Estate of Tapfuma Chiminya:

| | |
|---|---|
| Pain and suffering of Tapfuma Chiminya | $ 500,000 |
| Pain and suffering of Adella Chiminya | $1,000,000 |
| Loss of consortium of Adella Chiminya | $1,000,000 |
| **Compensatory Damages** | **$2,500,000** |
| **Punitive Damages** | **$5,000,000** |

Estate of Metthew Pfebve:

| | |
|---|---|
| Pain and suffering of Metthew Pfebve | $ 500,000 |
| Pain and suffering of Elliot Pfebve | $1,000,000 |
| **Compensatory Damages** | **$3,000,000** [6] |
| **Punitive Damages** | **$5,000,000** |

Estate of David Stevens:

---

5. The damages listed here are taken from the plaintiffs' Memorandum of Law in Support of the Motion for Judgment by Default instead of their complaint because the plaintiffs have described the damages they are seeking with greater specificity in their memorandum. In their Motion for Judgment by Default, the plaintiffs have significantly reduced the damages requested based on a more individualized assessment of the injuries suffered.

6. Since the plaintiffs request $500,000 more here for Efridah Pfebve than for the other three plaintiffs asking for the same type of damages, the Court assumes this was a clerical error, particularly in light of the fact that their overall total ($69,055,907) is $500,000 more than the $68,555,907 total they claim they are asserting.

| Pain and suffering of David Stevens | $ 500,000 |
| Pain and suffering of Maria Stevens | $1,000,000 |
| Loss of consortium of Maria Stevens | $1,000,000 |

| | Compensatory Damages | $2,500,000 |
| | Punitive Damages | $5,000,000 |

### Claim # 2: Torture

Estate of Metthew Pfebve:

| Pain and suffering for Metthew Pfebve | $ 500,000 |
| Emotional distress recoverable by Elliot and Efridah Pfebve | $ 500,000 |

| | Compensatory Damages | $1,000,000 |
| | Punitive Damages | $5,000,000 |

Estate of David Stevens:

| Pain and suffering of David Stevens | $ 500,000 |
| Emotional distress recoverable by Maria Stevens | $ 500,000 |

| | Compensatory Damages | $1,000,000 |
| | Punitive Damages | $5,000,000 |

### Claims # 3 and # 4: Targeting Political Rights

Adella Chiminya Tachiona

| | Compensatory Damages | $ 500,000 |
| | Punitive Damages | $1,000,000 |

Efridah Pfebve

| | Compensatory Damages | $ 500,000 |
| | Punitive Damages | $1,000,000 |

Efridah Pfebve

| | Compensatory Damages (includes loss to business) | $1,036,363 |
| | Punitive Damages | $5,000,000 |

Evelyn Masaiti

| | Compensatory Damages | $1,000,000 |
| | Punitive Damages | $5,000,000 |

### Claim # 5: Cruel, Inhuman, and Degrading Treatment

Tapfuma Chiminya

| | Compensatory Damages | $1,000,000 |
| | Punitive Damages | $5,000,000 |

Metthew Pfebve

| | Compensatory Damages | $1,000,000 |
| | Punitive Damages | $5,000,000 |

David Stevens

| | Compensatory Damages | $1,000,000 |
| | Punitive Damages | $5,000,000 |

### Claim # 6: Racial Discrimination

David Stevens

| | Compensatory Damages | $ 500,000 |
|---|---|---|
| Maria Stevens | | |
| | Compensatory Damages | $ 500,000 |

*Claim # 7 Unlawful Seizure or Destruction of Property*

| Evelyn Masaiti | | |
|---|---|---|
| | Compensatory Damages | $ 19,544 |

---

(Motion for Default Judgment at 17–23). In addition to the specific punitive damages requested, the plaintiffs make a general request for punitive damages for claims six and seven. (Motion for Default Judgment at 23–24).

At the inquest and in post-hearing papers submitted to the Court, the plaintiffs have also made an additional request for damages in excess of those originally pled in their complaint and their motion for default judgment. (Tr. 9; Plaintiffs' Memorandum of Law Regarding the Award of Damages in a Default Judgment ("Pl. Damage Memo.")).[7]

Generally, a court may not award damages in excess of the amount alleged in the complaint pursuant to Rule 54(c) of the Federal Rules of Civil Procedure which provides that a "judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." The rational for this rule is that "the defending party should be able to decide on the basis of the relief requested in the original pleading whether to expend the time, effort, and money necessary to defend the action." *Ainbinder v. Bernice Mining & Contracting Inc.*, No. 01 Civ. 2492, 2002 WL 461576, at *3 (S.D.N.Y. March 26, 2002) (quoting 10 Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice & Procedure* § 2663 (3d ed.1998)).

In this case, the plaintiffs argue that they should not be held to the figures alleged in their complaint because they requested "at least" or "in excess of" a certain specified amount for each claim. (Pl. Damage Memo. at 1). They further argue that the total minimum amount of damages asked for in the complaint exceeds the $68,500,000 amount asked for in their Motion for Default Judgment. (Pl. Damage Memo. at 1). And finally, they argue that the defendant was clearly put on notice of all the damages sought in the case. (Pl. Damage Memo. at 8).

Courts in this circuit have held that "[a]s long as the defaulting party receives adequate notice of the relief sought and is afforded a meaningful opportunity to oppose it, the purpose of Rule 54(c) is served." *Gucci America v. Gold Center Jewelry*, 997 F.Supp. 399, 405 (S.D.N.Y.), *rev'd on other grounds*, 158 F.3d 631 (2d Cir.1998). In *D'Orange v. Feely*, the plaintiff sought relief in an amount in excess of $120,000 and the court saw fit to grant the plaintiff $1,361,583, many more times the amount requested. 894 F.Supp. 159, 163 (S.D.N.Y.1995), *aff'd*, 101 F.3d 1393, 1996 WL 446254 (2d Cir.1996); *see also Henry v. Sneiders*, 490 F.2d 315, 317 n. 2 (9th Cir.1974) (where plaintiff request-

---

7. In their complaint, the plaintiffs had sought at least $48 million in compensatory damages and $225 million in punitive damages for the named plaintiffs. They also requested additional damages for unnamed class members.

ed damages of $71,243.68 and "Plaintiff's other damages as are proved at the time of trial," court awarded more than three times the minimum damages specified in complaint); *Xuncax*, 886 F.Supp. at 198–99 (where victim of torture requested damages "in excess of $1,000,000" court awarded her $3,000,000).

There is little doubt that the defendant was put on notice as to the significant amount of damages at stake in this case. The defendant was served with the complaint and the plaintiffs' Motion for Default Judgment. The defendant further illustrated its knowledge of the pending case when it requested the U.S. Department of State to intervene on its behalf and seek a dismissal of the complaint based on immunity. And finally, the complaint requested amounts "in excess" of each specific amount requested, not to mention class certification status, thus further putting the defendant on notice that the amount of damages could be extremely high.

Accordingly, this Court clearly has authority to award damages not only in excess of the baseline amount of $68,555,907 requested in their default judgment submission but also exceeding the approximately $273 million minimum sought in their complaint.

### D. *Damages Awarded*

Since the ATCA and the TVPA do not provide specific guidance regarding the amount of recovery to which a successful plaintiff is entitled under the statutes, it is helpful to look at damage awards provided by other courts under these statutes.

### 1. *Claims 1–2: Extrajudicial Killing and Torture*

In *Filartiga*, the court was faced with a similar situation where the plaintiffs were relatives of a victim tortured to death in retaliation for the plaintiff's opposition to the ruling political party. 577 F.Supp. at

861. There, the court awarded the victim's father and sister approximately $385,000 in compensatory damages and $5,000,000 each in punitive damages. *Id.* at 867. In *Mushikiwabo v. Barayagwiza*, a more recent case, the court awarded the relatives of victims of torture and extrajudicial killing between $10.7 million and $35.2 million each in compensatory and punitive damages combined. No. 94 Civ. 3627, 1996 WL 164496, at *3 (S.D.N.Y. April 9, 1996). Other courts have awarded amounts in a similar range for both compensatory and punitive damages in cases involving torture and extrajudicial killings. *See Xuncax*, 886 F.Supp. at 198 (victims of summary execution awarded $2,000,000 in compensatory and $5,000,000 in punitive damages each; torture victims awarded $1,000,000 in compensatory damages and $2,000,000 in punitive damages); *Id.* at 199 n. 45 (citing *inter alia Martinez–Baca v. Suarez–Mason*, No. 87 2057 SC (N.D. Cal. April 22, 1988) (for systematic arbitrary detention and torture, $11,170,699 in compensation, $10,000,000 in punitive damages); *Forti v. Suarez*, No. 87–2058–DLJ (N.D. Cal. April 25, 1990) (for arbitrary detention, torture, witnessed abuse, and execution of brother, $3,000,000 in compensatory, $3,000,000 in punitive); *Siderman v. Argentina*, No. CV–82–1772–RMT (MCx), 1984 WL 9080 (C.D.Cal. Sept.28, 1984) (for torture, compensatory damages of $2,607,575.63), *vacated on other grounds*, No. CV–82–1772–RMT (MCx) (C.D.Cal. March 7, 1985); *Quiros de Rapaport, et al., v. Suarez–Mason*, No. C87–2266 JPV (N.D. Cal. April 11, 1989) (for torture and murder of one victim and disappearance of another, court awarded $10,000,000 in compensation and $10,000,000 in punitive damages to victims' widows and $5,000,000 in compensation and $5,000,000 in punitive damages to victims' mother and sister); *Todd v. Panjaitan*, No. CV–92–12255–PBS, 1994 WL

827111 (D.Mass. Oct.26, 1994) (awarding $2,000,000 in compensation to victim's estate, $2,000,000 to mother in compensation, and $10,000,000 in punitive damages); *Paul v. Avril,* 901 F.Supp. 330, 335 (S.D.Fla.1994) (six victims of torture and arbitrary detention each awarded between $2,500,000 and $3,500,000 in compensatory damages and $4,000,000 in punitive damages).

In light of the range of awards found to be reasonable in previous cases dealing with similarly horrendous acts of brutality, I am prepared to adopt and recommend the plaintiffs' request for an award of $2,500,000 in compensatory damages [8] and $5,000,000 in punitive damages each for the murder of Tapfuma Chiminya Tachiona, Metthew Pfebve, and David Stevens and $1,000,000 in compensatory damages and $5,000,000 in punitive damages each for the torture of Metthew Pfebve and David Stevens. The record developed by the plaintiffs' lawyers, which included testimony and declarations from relatives of the victims attesting to the grief they have suffered as a result of the killings of the three men and declarations from people who witnessed the kinds of torture inflicted on Metthew Pfebve and David Stevens before their deaths, is more than sufficient to justify the awards for pain and suffering that the plaintiffs request.

### 2. *Claims 3–4: Targeting Political Rights*

The plaintiffs next request damages for the violation of their political rights. Specifically, plaintiffs Elliot Pfebve and Evelyn Masaiti request damages because the defendant "aimed their brutal attacks to intimidate [them] from expressing political beliefs, from running for office in the Zimbabwean Parliamentary elections, and from speaking at MDC rallies or associat-

ing with the MDC party." (Motion for Default Judgment at 21). The plaintiffs further request damages for Adella Chiminya and Efridah Pfebve because the defendant's "brutal murder of [their family members] was to intimidate all those who knew [them] from being supportive of the MDC or from in any way expressing opposition to ZANU–PF." (Motion for Default Judgment at 21).

Although there is little precedent by way of damages for these types of violations under the ATCA, it is useful to look to damages awarded in the United States for violations of First Amendment rights, which include the freedoms of speech, assembly, protest, and association. *See Hobson v. Wilson,* 556 F.Supp. 1157, 1189 (D.D.C.1982) ("compensatory damages embrace proven out-of-pocket damages and a fair and reasonable amount for any proven physical pain, mental suffering, and for the intangible, though nonetheless real, loss of First–Amendment rights"), *rev'd in part on other grounds,* 737 F.2d 1 (D.C.Cir. 1984); *see also Petramale v. Local Number 17 of Laborers' International Union of North America,* 847 F.2d 1009, 1013 (2d Cir.1988) ($100,000 compensatory damages for emotional distress suffered when disciplinary action initiated for speech); *Phillips v. Bowen,* 115 F.Supp.2d 303, 306 (N.D.N.Y.2000) (upholding award of $400,000 for emotional damages in § 1983 retaliation case for exercise of right to free speech), *aff'd,* 278 F.3d 103 (2d Cir.2002); *Ikram v. Waterbury Board of Education,* No. 3:95 Civ. 2478, 1997 WL 597111, at *3–4 (D.Conn. Sept.9, 1997) (compensatory award of $100,000 reasonable in First Amendment retaliation claim).

The plaintiffs have sufficiently documented the way in which ZANU–PF systematically hounded its political opponents

---

8. For purposes of this analysis, I have rolled together pain and suffering and economic damages except in those instances where the plaintiffs have provided detailed information.

through repeated acts of terror and violence. MDC supporters were constantly harassed, peaceful assemblies were interrupted by mobs of ZANU–PF supporters attacking MDC supporters, assassination attempts were made on MDC candidates, and MDC supporters were killed. Therefore, I recommend awarding the plaintiffs the following: (1) $500,000 in compensatory and $1,000,000 in punitive damages each for Adella Chiminya and Efridah Pfebve; (2) $1,000,000 in compensatory and $2,000,000 in punitive damages each for Elliot Pfebve and Evelyn Masaiti; and (3) $19,544 ($1,075,000 Zimbabwean dollars divided by exchange rate of 55:1) requested by Ms. Masaiti for loss to her property[9] and $230,909 (ZIM $12,700,000 divided by exchange rate of 55:1) to Mr. Pfebve for loss to his property and loss to his business.

### 3. *Claim 5: Cruel, Inhuman, and Degrading Treatment*

The plaintiffs next request damages under the ATCA for the cruel, inhuman, and degrading treatment they were subjected to at the hands of the defendant. Courts have held generally that "cruel, inhuman, or degrading treatment includes acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of 'torture' or do not have the same purposes as 'torture.'" *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1348 (N.D.Ga.2002) (footnote omitted). In *Xuncax*, a number of plaintiffs with a variety of experiences brought claims for cruel, inhuman, and degrading treatment against the Guatemalan Minister of Defense. The court awarded damages in the following manner: (1) plaintiffs who witnessed the torture or severe mistreatment of an immediate rela-

tive were awarded $1,000,000 in compensatory and $1,000,000 in punitive damages; (2) plaintiffs who had grenade thrown at them were awarded $750,000 in compensatory and $750,000 in punitive damages; and (3) plaintiffs who watched soldiers ransack their home and threaten their family were awarded $500,000 in compensatory and $500,000 in punitive damages. 886 F.Supp. at 169–71, 198.

In this case, although the plaintiffs only make specific damage requests for the three men who were tortured and murdered in their Motion for Default Judgment, (Motion for Default Judgment at 22), in their complaint, they requested damages in this category for all of the named plaintiffs. (Compl., ¶ 200).

Based on the ranges set forth in *Xuncax*, I recommend the following awards: (1) $1,000,000 in compensatory damages and $4,000,000 in punitive damages each for the cruel, inhuman, and degrading treatment suffered by Tapfuma Chiminya, Matthew Pfebve, and David Stevens prior to their death, including being bound and gagged and forced to ride in a vehicle for hours, being dragged down the street in front of neighbors and loved ones, and being placed in fear of impending death; (2) $1,000,000 in compensatory damages and $3,000,000 in punitive damages for the treatment suffered by Efridah Pfebve who had to watch her elderly mother being stoned by an angry mob while hiding in an outdoor bathroom, see her brother and elderly father being dragged down the street and beaten, and observe her home being ransacked; and (3) $750,000 in compensatory damages and $1,500,000 in punitive damages each to Evelyn Masaiti and Elliot Pfebve who lived with constant

---

**9.** Although the plaintiffs request this amount of money for Ms. Masaiti under their seventh claim (Seizure or Destruction of Property), it is more appropriate here since, as in Mr. Pfebve's case, these costs represent a direct economic loss as a result of the violation of Ms. Masaiti's political rights.

threat of death by the defendant and who suffered repeated attacks to their persons, families, and property.

### 4. *Claims 6–7: Racial Discrimination and the Unlawful Seizure of Property*

In the final two claims, the plaintiffs request $500,000 in compensatory damages each to Maria and David Stevens for the racial violence and terror they were subjected to by the defendant. (Motion for Default Judgment at 22). They also request compensation for the loss of the Stevens' farm which has been taken over by ZANU–PF and ZWVA supporters.[10] The plaintiffs' complaint, their motion for default judgment, the attached articles, and the declaration of Stuart Gemmill adequately demonstrate the racial animus that motived the defendant's actions toward these plaintiffs. (Compl., ¶¶ 39–43, 202–04; Motion for Default Judgment at 8 & Exhs. 13, 15; Gemmill Decl., ¶ 19).

Again, since there is little guidance from previous decisions awarding damages on these types of claims under the ATCA, it is helpful to look at federal court decisions awarding damages for violations of civil rights in the United States. In *Johnson v. Smith,* the court awarded an interracial couple $30,000 in compensatory damages for intangible harm and $60,000 in punitive damages against three individual defendants for burning a cross on their lawn and throwing a brick through their window with the sole intention of driving the plaintiffs out of the neighborhood. 890 F.Supp. 726, 728–29 (N.D.Ill.1995). In so doing, the court noted that these types of actions induce "terror and other emotional distress" and should receive greater compensation than those acts of race-based dis-

crimination in which violence plays no part. *Id.* at 728.

Here, the terror and violence that accompanied the defendant's efforts to drive the Stevens family off its property far exceeds those discussed in *Johnson* and warrants a substantially higher damage award. The Stevens' farm was repeatedly invaded by angry mobs of ZANU–PF supporters who performed acts of violence on their property. Their employees were harassed and assaulted. Ultimately Mr. Stevens was kidnapped and murdered and Ms. Stevens has since lost her farm and family home. Therefore, I recommend the following awards: (1) $500,000 in compensatory damages and $1,000,000 in punitive damages each to Maria and David Stevens for the racial violence and terror they were subjected to by the defendant; and (2) $1,000,000 in compensatory damages and $2,000,000 in punitive damages for the loss of their farm, their home, and all of their possessions.

### *Conclusion*

For the reasons set forth above, I recommend that judgment be entered in favor of the plaintiffs and against the defendant for $20,250,453 in compensatory damages and for $53,000,000 in punitive damages for a total award of $73,250,453. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Victor Marrero, Room 414, 40 Foley Square, New York, New York 10007 and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New

---

10. Although the plaintiffs omit any reference to the Stevens' farm in their Motion for a Default Judgment, in their complaint they requested $1,000,000 in compensatory damages and $5,000,000 in punitive damages. (Compl., ¶¶ 212–13).

York 10007. Failure to file timely objections will preclude appellate review.

July 1, 2002.